UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

CHRISTOPHER & CHRISTINE
VAN COMPERNOLLE,

        Plaintiffs,

v.

                                File No.  1:05-CV-133

THE CITY OF ZEELAND &
CHIEF WILLIAM OLNEY, and
TIMOTHY KLUNDER, individually and
in their official capacity,

        Defendants.

_____/

                                HON. ROBERT HOLMES BELL

## **O P I N I O N**

    Plaintiff Christopher Van Compernolle is a former police officer with the City of Zeeland Police Department.  Van Compernolle commenced this lawsuit against Defendants City of Zeeland ("the City"), William Olney, Chief of the Zeeland Police Department, and Timothy Klunder, the City Manager, following his dismissal from employment with the police department.  Van Compernolle alleges violations of both federal and state law.  He contends that his firing violated the Americans with Disabilities Act, 42 U.S.C. §§ 12101–12300 ("ADA"), and Michigan's Persons with Disabilities Civil Rights Act, MICH. COMP. LAWS §§ 37.1101–37.1607 ("PWDCRA"), infringed upon his First Amendment right of freedom of speech and association in violation of 42 U.S.C. § 1983, and that Defendants' actions constituted intentional infliction of emotional distress.  Van Compernolle's wife,

Christine Van Compernolle, also asserts a claim of loss of consortium against all Defendants. Defendants have moved for summary judgment on each of Van Compernolle's claims. For the reasons that follow, Defendants' motion is granted on Van Compernolle's ADA and § 1983 claims. As such, the Court declines to take supplemental jurisdiction over Van Compernolle's remaining state law claims and dismisses the suit in its entirety.

I.

The following relevant facts are undisputed or, where disputed, taken in the light most favorable to Plaintiff. Van Compernolle began his employment with the City of Zeeland Police Department in 1991. While he initially worked as a part-time police officer, by 1992, he was working full-time with the department. By all accounts, Van Compernolle performed his job in an exemplary fashion. He received favorable performance reviews throughout the span of his career, undertook field training responsibilities for the department, and eventually rose to the level of senior patrol officer. Van Compernolle was also held in high esteem by his fellow officers and was often sought out when officers had job-related questions. Van Compernolle was also an active member of the police officer's union and served as union president.

At the time of the events underlying this case, the City police force consisted of seven full-time police officers, three or four part-time police officers, a sergeant, and chief. As a small department, the officers themselves were responsible for keeping track of their work hours and submitting biweekly payroll sheets. Before the payroll sheets were submitted to

the City finance department for issuance of paychecks, Chief Olney reviewed each submission. Although Van Compernolle was a role model in the field for his fellow officers, beginning in 2002, he was subject to discipline resulting from errors on his payroll sheet. In March 2002, Chief Olney became aware of discrepancies in Van Compernolle's payroll records. After investigating the matter, Chief Olney determined that on four dates Van Compernolle submitted work hours when in fact he had not worked. As a result, Van Compernolle was compensated for hours he did not work. In total, he was compensated for 28 additional hours that he had not worked. Although Chief Olney considered harsher penalties, he determined that Van Compernolle's error violated a departmental rule prohibiting neglect of duty and imposed a four-day suspension without pay. Through a compromise between Olney and Van Compernolle, the suspension was reduced to one day and the remaining three days were held in abeyance for a 24-month period.

In early 2004, Plaintiff was again disciplined for a false payroll sheet. The error on the payroll sheet was similar to his previous violation in that he was compensated for hours which he did not in fact work. Olney Dep. at 195-96. The second incident arose after Van Compernolle submitted an incomplete payroll sheet and Chief Olney requested that he file a complete form to insure an accurate record. Van Compernolle Dep. at 102; Olney Dep. at 193-94. When Van Compernolle submitted the completed form, Chief Olney noticed another discrepancy. In a memo dated April 26, 2004, Chief Olney informed Van Compernolle of the violation and imposed an eight-day suspension because it was his

second offense.  Chief Olney and Van Compernolle again agreed to a compromise in which he would not be suspended for the days held in abeyance from his previous discipline, but would  forfeit eighty hours of earned compensatory time.  Chief Olney also reminded Van Compernolle, "that a third offense violation of this rule is punished by dismissal." April 26, 2004 Memo, Exhibit E, Pl.'s Compl.  Following the second disciplinary action, Van Compernolle spoke to both Chief Olney and Klunder in an effort to alter the system by which payroll sheets were done.  Van Compernolle explained that his mistakes were not intentional and suggested that the department adopt a different procedure.  Van Compernolle Dep. at 119-20.  Neither Chief Olney or Klunder altered the payroll sheet process in response to Van Compernolle's complaints.

Also in early 2004, the City posted a new Corporal position within the police department.  The police officers agreed among themselves that Van Compernolle would be the only officer to apply for the position.  Although Van Compernolle was the only applicant, Chief Olney did not select him for the promotion due to the previous discipline problems. In response, Van Compernolle briefly pursued a grievance.  This grievance was ultimately denied.

Three months later, in July 2004, Chief Olney again noticed that Van Compernolle submitted an erroneous payroll sheet indicating that he had worked twelve hours on a day that  he  called  in  sick.    Chief  Olney  did  not  immediately  bring  this  matter  to Van Compernolle's attention, but did provide him with updated sick leave balance sheets,

4

apparently in the hope that he would correct the inaccuracy on his own. When the error was not corrected, Chief Olney confronted Van Compernolle. Chief Olney, Van Compernolle, and Officer Troy Van Gelderen, a union representative, met to discuss the incident. Exhibit 4, Pl.'s Res. Br. Van Compernolle acknowledged that the time sheet did not accurately reflect his actual work hours but denied that this error was intentional. He also explained the difficulty that he had with filling out each payroll sheet. He also indicated that "I've obviously got some issue that's prohibiting me from doing these stupid things as well as I should do them." Exhibit 4, August 9, 2004 Disciplinary Hearing at 13. Following the meeting, Chief Olney determined that Van Compernolle should be terminated. This recommendation was presented to City Manager Klunder. After discussing the issue with Chief Olney, Klunder agreed that Van Compernolle should be dismissed. Van Compernolle was notified of his termination on August 24, 2004.

Prior to his termination, on August 16, 2004, a group of Van Compernolle's fellow officers met with Klunder to discuss his time card infractions. Van Gelderen suggested that "there was something not right with Chris [Van Compernolle]" and indicated that the officers thought he may have Attention Deficit Disorder (ADD). Van Gelderen Aff. at ¶ 46, Klunder Dep. at 151-52. Van Gelderen and the officers also informed Klunder that they believed many of the other officers made similar payroll sheet errors but were not disciplined. Van Compernolle did consult a psychologist, Raymond Herzog, beginning August 18, 2004.

On September 2, 2004, Van Compernolle was diagnosed with Attention Deficit Hyperactivity Disorder (ADHD), bipolar II disorder, and depression.[1]

Following his dismissal, Van Compernolle immediately filed a grievance contending that the police department lacked just cause for the dismissal.  Chief Olney denied Van Compernolle's grievance.  Van Compernolle appealed to Klunder, the second step in the grievance process under the parties' labor agreement.  On September 10, 2004, Van Gelderen, Kevin Cisler, Fred LaMaire, a union representative, and Van Compernolle met with Klunder. At this time, the officers informed Klunder that Van Compernolle had been diagnosed with ADHD.  Klunder Dep. at 156.  The officers also reiterated their belief that Van Compernolle was subject to disparate treatment.

Following the meeting, on September 15, 2004, Klunder issued a memo addressing the topics discussed at the previous meeting, and concluding that the City had just cause for firing  Van  Compernolle.    Consequently,  the  grievance  was  denied.    Thereafter, Van Compernolle continued to pursue the grievance to the city council.  Van Compernolle provided additional information documenting his recent ADHD diagnosis as well as his claim of disparate treatment.  In addition to this evidence, the city council also heard testimony from two officers in support of Van Compernolle.[2]  Subsequently, the city council

---

[1]Throughout their briefs, the parties have interchangeably referred to both ADD and ADHD as Van Compernolle's diagnosis.  For ease of reference, the Court will refer only to ADHD.

[2]The record does not appear to contain a transcript of the testimony given by the two officers before the city council.

voted to affirm the denial of the grievance.  Following this decision, Van Compernolle sought to arbitrate his grievance, the final step in the grievance process.  The arbitrator determined that the City had satisfied the "just cause" requirement of the labor agreement and denied the grievance.

In May 2005, Van Compernolle was hired as a part-time police officer with the Covert Township Police Department.  In addition to his part-time position with Covert, since 2000, Van Compernolle has owned and operated a small business called Ecco-Reef, a store specializing in salt water aquariums.  Van Compernolle and his wife filed the present suit on February 15, 2005.  Van Compernolle's principal allegation is that his termination was both discrimination based on his disability in violation of the ADA and PWDCRA and improper retaliation for his union activities contrary to the First Amendment and in violation of 42 U.S.C. § 1983.  Van Compernolle also asserts two state common law claims, intentional infliction of emotional distress and loss of consortium.  Defendants have moved for summary judgment on each of Plaintiffs' claims.

## II.

Summary judgment is appropriate when the record reveals that there are no issues as to any material fact in dispute and the moving party is entitled to judgment as a matter of law. FED. R. CIV. P. 56(c); *Kalamazoo Acquisitions, L.L.C. v. Westfield Ins. Co.*, 395 F.3d 338, 342 (6th Cir. 2005); *Layne v. Bank One, Ky, N.A.*, 395 F.3d 271, 275 (6th Cir. 2005).  The standard for determining whether summary judgment is appropriate is whether "the evidence

presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Tucker v. Union of Needletrades, Industrial and Textile Employees*, 407 F.3d 784, 787 (6th Cir. 2005) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986)).  The Court must consider all pleadings, depositions, affidavits, and admissions on file, and draw all justifiable inferences in the favor of the party opposing the motion.  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *Minadeo v. ICI Paints*, 398 F.3d 751, 756 (6th Cir. 2005).

Once the movant shows that "there is an absence of evidence to support the nonmoving party's case," the non-moving party has the burden of coming forward with evidence raising a triable issue of fact.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  Although the facts are viewed in the light most favorable to the non-movant, they may not rest on the mere allegations of his pleadings.  FED. R. CIV. P. 56(e); *Daniel v. Cantrell*, 375 F.3d 377, 381 (6th Cir. 2004).  "A mere scintilla of evidence is insufficient." *Humenny v. Genex Corp.*, 390 F.3d 901, 904 (6th Cir. 2004).  Rather, a party with the burden of proof opposing a motion for summary judgment has the burden to come forth with requisite proof to support his legal claim, particularly where he has had an opportunity to conduct discovery. *See Cardamone v. Cohen*, 241 F.3d 520, 524 (6th Cir. 2001).

III.

A.    *Americans with Disabilities Act & Persons with Disabilities Civil Rights Act*

Van Compernolle first alleges that the City violated the ADA and PWDCRA by dismissing him from his employment with the police department.  Van Compernolle contends that he was terminated, in part, based upon his disability resulting from ADHD, bipolar disorder, and depression.

The ADA prohibits employers from discriminating against disabled employees because of a disability.  42 U.S.C. § 12112(a).[3]  In order to establish a *prima facie* case of disability discrimination under the ADA, a plaintiff must demonstrate that: (1) he is an individual with a disability; (2) he is otherwise qualified to perform the job requirements, with or without reasonable accommodation; and (3) he was discharged solely by reason of his handicap.  *Monette v. Elec. Data Sys. Corp.*, 90 F.3d 1173, 1178 (6th Cir. 1996). Van Compernolle's ADA claim falters on this third prong.  He plainly does not contend that he was discharged solely by reason of his handicap, rather as he states in his brief, "the motives of the Defendants were mixed" between retaliating against him for his union activities and because he was disabled.  Pl.'s Res. Br. at 26.  The Sixth Circuit has expressly prohibited ADA plaintiffs from prosecuting mixed motive cases.  *See Hedrick v. Western*

---

[3]The PWDCRA substantially mirrors the ADA, consequently, resolution of Van Compernolle's ADA claim will also resolve his PWDCRA claim.  *Cotter v. Ajilon Services, Inc.*, 287 F.3d 593, 597 (6th Cir. 2002); *Austin v. Fuel Systems, LLC*, 379 F. Supp. 2d 884, 904 n. 11 (W.D. Mich. 2004) (Quist, J.).

*Reserve Care Sys.*, 355 F.3d 444, 454 (6th Cir. 2004) (holding that district court did not err in requiring ADA plaintiff to show that her disability was the sole reason for defendant's adverse employment action); *McLeod v. Parsons Corp.*, 73 F. App'x. 846, 858 (6th Cir. 2003) ("We decline [plaintiff's] request that this panel permit plaintiffs to recover under the ADA in mixed motive cases.  Adopting the approach followed by several other circuits would require the panel to make a substantial departure from this Court's holdings in *Walsh* and *Monette*.").  Accordingly, for this reason alone Van Compernolle is precluded from pursuing his ADA claim.

In any event, because Van Compernolle's claim suffers from numerous deficiencies, even if the Court considered the merits of his ADA claim it would fail.  Disability discrimination can be established through either direct or indirect evidence.  *Monette*, 90 F.3d at 1178.  In this case, Van Compernolle seeks to establish his case indirectly.  Accordingly, the well-known, burden-shifting framework of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), applies to the *prima facie* case.  *Hedrick*, 355 F.3d at 453.  Van Compernolle must show that:

> (1) he is disabled; (2) otherwise qualified for the position, with or without reasonable accommodation; (3) suffered an adverse employment decision; (4) the employer knew or had reason to know of the plaintiff's disability; and (5) the position remained open while the employer sought other applicants or the disabled individual was replaced.  The defendant must then offer a legitimate explanation for its action.  If the defendant satisfies this burden of production, the plaintiff must introduce evidence showing that the proffered explanation is pretextual.  Under this scheme, the plaintiff retains the ultimate burden of persuasion at all times.

10

*Id.*; *Monette*, 90 F.3d at 1186-87.  There is no dispute between the parties on the second, third, and fifth prongs of the *prima facie* case.  The City, however, argues that Van Compernolle is unable to show that he is "disabled" as that term is defined for purposes of the ADA, and, even if he is considered disabled his employer did not know or have reason to know of his disability.  Defendants argument is well taken on both prongs of the prima facie case and, as a result, dooms Van Compernolle's claim.

1.      *Whether Van Compernolle is "disabled" under the ADA?*

The Court must make an individualized inquiry into whether Van Compernolle is disabled.  *Sutton v. United Air Lines, Inc.*, 527 U.S. 471, 483 (1999).  The ADA defines disability as: (A) a physical or mental impairment that substantially limits one or more of the major life activities of such individual; (B) a record of such an impairment; or (C) being regarded as having such an impairment.  42 U.S.C. § 12102(2); *Parry v. Mohawk Motors of Michigan, Inc.*, 236 F.3d 299, 310 (6th Cir. 2000).  The parties do not dispute that ADHD, bipolar disorder, and depression are physical or mental impairments.  *See e.g.*, *Wright v. CompUSA Inc.*, 352 F.3d 472, 475 (1st Cir. 2003) (evaluating whether plaintiff's ADD substantially limited him in a major life activity); *Doebele v. Sprint/United Mgmt. Co.*, 342 F.3d 1117 (10th Cir. 2003) (same); *Hill v. Metro. Gov't of Nashville*, 54 F. App'x 199, 200-01 (6th Cir. 2002) (noting that bipolar disorder is a mental impairment); *Swanson v. Univ. of Cincinnati*, 268 F.3d 307, 314 (6th Cir. 2001) (assuming that major depression is a mental impairment).  But "[m]erely having an impairment does not make one disabled for purposes

11

of the ADA." *Toyota Motor Mfg., Kentucky, Inc. v. Williams*, 534 U.S. 184, 195 (2002).

Consequently, the parties have focused their analysis on whether Van Compernolle's ADHD,

depression, and bipolar disorder substantially limited one or more of his major life activities.[4]

In order to assist courts in evaluating whether a disability substantially limits a major

life activity, the Sixth Circuit looks to the guidelines promulgated by the Equal Employment

Opportunity Commission ("EEOC").  *See e.g.*, *Swanson*, 268 F.3d at 314 (noting that

Congress did not assign authority to a federal agency to issue regulations interpreting the

ADA but applying the guidelines and assuming they are reasonable); *Kiphart v. Saturn

Corp.*, 251 F.3d 573, 582 (6th Cir. 2001); *see also Sutton*, 527 U.S. at 479.  The guidelines

define the phrase "substantially limits" as follows:

> (i) Unable to perform a major life activity that the average person in the
> general population can perform; or
> (ii) Significantly restricted as to the condition, manner or duration under which
> an individual can perform a particular major life activity as compared to the
> condition, manner, or duration under which the average person in the general
> population can perform that same major life activity.

29 C.F.R. § 1630.2(j)(1).  The guidelines also outline certain factors that a court should

consider in determining whether an individual is substantially limited in a major life activity:

(i) the nature and severity of the impairment; (ii) the duration or expected duration of the

impairment; and (iii) the permanent or long term impact, or the expected permanent or long

---

[4]Van Compernolle briefly addresses whether the City regarded him as having an impairment.   He has not offered any evidence to support this claim.   At best, Van Compernolle has offered speculation and conjecture regarding this aspect of the disability.  Consequently, the Court will not address this issue.

term impact of or resulting from the impairment.  29 C.F.R. § 1630.2(j)(2).  The guidelines also define "major life activities" as "functions such as caring for oneself, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, and working."  29 C.F.R. § 1630.2(i).  The activities listed are simply illustrative and are not exhaustive.  *MX Group, Inc. v. City of Covington*, 293 F.3d 326, 337 (6th Cir. 2002) (citing *Bragdon v. Abbott*, 524 U.S. 624, 639 (1998)).

The Supreme Court has provided additional guidance on the interpretation of "substantially limits" and "major life activities."  In *Toyota Motor Mfg., Kentucky, Inc. v. Williams*, 534 U.S. 184, 197 (2002), the Court made clear that these terms are "to be interpreted strictly to create a demanding standard for qualifying as disabled."  The Court also indicated that "substantially" in the statutory term suggested "considerable in amount, value or worth" and "to a large degree," and held that impairments that are moderate or minor are not sufficient.  *Id.* at 196-97, *Mahone*, 295 F.3d at 590-91 ("[The Supreme Court's] decision makes clear that any impairment that only moderately or intermittently prevents an individual from performing major life activities is not a substantial limitation under the Act.") (citing *Williams*, 534 U.S. at 196-97).  Moreover, the Court held that in light of the fact that "major" in "major life activities" means "important," the statutory term "refers to those activities that are of central importance to daily life."  *Id.* at 197.

In his complaint, Van Compernolle alleged that his ADHD, depression, and bi-polar disorder, impaired multiple major life activities "including reading, adding and subtracting,

13

concentrating, sleeping, eating and other activities." Compl. ¶ 89. In response to Defendants'

motion, Van Compernolle has not offered any evidence to support a substantial limitation in

his ability to read, sleep, or eat.[5]  He has, however, offered evidence that he has short term

memory problems, difficulty multi-tasking, concentrating, and an inability to attend to certain

mundane details and tasks.  The evidence offered focuses, with a few minor exceptions, on

Van Compernolle's difficulty with filling out his biweekly payroll sheet while employed with

the City's police department.

Van Compernolle's claim suffers from a variety of problems, each leading to the

conclusion that he has failed to establish that he is "disabled" for purposes of the ADA and,

therefore, cannot satisfy the first prong of the prima facie case.  As a threshold matter, the

ability to concentrate is not a major life activity within the meaning of the ADA.  *See Pack*

*v. Kmart Corp.*, 166 F.3d 1300, 1305 (10th Cir. 1999) (holding that concentration is not a

major life activity).  The Sixth Circuit has followed the Tenth Circuit's decision in *Pack* and

also concluded that concentration is not a major life activity.  *See Boerst v. General Mills*

*Operations, Inc.*, 25 F. App'x 403, 406 (6th Cir. 2002); *Linser v. Ohio, Dept. of Mental*

*Health*, No. 99-3887, 2000 WL 1529809, *3 (6th Cir. Oct. 6, 2000); *see also Starks-Umoja v.*

---

[5]Moreover, beyond the diagnosis of bipolar disorder and depression, Van Compernolle has not offered any evidence demonstrating how these particular impairments substantially impair a major life activity.  *See Williams*, 534 U.S. at 198 (holding that it is insufficient to prove disability status by submitting evidence of a medical diagnosis alone). Van Compernolle appears to have limited the evidence supporting his disability to the effects of his ADHD.

*Fed. Express Corp.*, 341 F. Supp. 2d 979, 991 (W. D. Tenn. 2003).  Moreover, it is possible to construe short-term memory loss, difficulty multi-tasking and inattentiveness to detail and mundane tasks as aspects of the function of thinking.  The Sixth Circuit has expressed doubt that thinking constitutes a major life activity.  *Hill*, 54 F. App'x at 201; *but see Battle v. United Parcel Service, Inc.*, 438 F.3d 856, 861 (8th Cir. 2006) (holding that thinking is a major life activity); *Head v. Glacier Northwest Inc.*, 413 F.3d 1053, 1061 (9th Cir. 2005) (same); *Taylor v. Phoenixville Sch. Dist.*, 184 F.3d 296, 307 (3d Cir. 1999) (same).  The Court will give Van Compernolle the benefit of the doubt, and will assume that short-term memory, multi-tasking, inattention to detail and mundane tasks are aspects of the major life activity of thinking.

In support of Van Compernolle's claim, he cites his own deposition testimony, the testimony of his treating psychologist, Raymond Herzog, and the testimony of his wife.  In brief summary, the evidence presented attempts to show that his ADHD prohibits him from accurately filling out his payroll sheet and from completing other mundane, clerical tasks.  Van Compernolle testified that when he attempted to complete his payroll sheet he would lose focus, forget his work hours, and inaccurately complete the payroll record.  Van Compernolle Dep. at 72-73.  He also testified that after he was disciplined for his inaccurate payroll records, he felt additional pressure to correctly fill out the form, resulting in increased inattentiveness.  Van Compernolle Dep. at 89.  Van Compernolle did testify, however, that he had no trouble completing other clerical tasks involved in police work, such

as writing tickets, filling out warrant requests, evidence forms, and other police reports. Van Compernolle Dep. at 68-71. Further he testified that his inattentiveness effected certain tasks in his small business, such as inventory and remembering scheduled service appointments. Van Compernolle Dep. at 36, 38. Van Compernolle also reported that in his current position with the Covert Police Department he occasionally has difficulty with mileage forms, but "the same is true with anybody else that works there." Van Compernolle Dep. at 27.

Herzog testified that Van Compernolle's experience was consistent with the symptoms of ADHD. Herzog Dep. at 66. Specifically, he explained that he was not surprised that Van Compernolle was able to excel at certain clerical aspects of his job but experience difficulty with filling out his payroll sheets. Herzog Dep. at 63, 68. Herzog also agreed that Van Compernolle's symptoms could be exacerbated due to increased pressure to perform. Herzog Dep. at 66. Finally, Van Compernolle's wife, Christine, testified that he would forget to do everyday tasks like picking up items at the store or picking up their kids and would routinely forget her birthday. Ms. Van Compernolle Dep. at 33, 37.

It is tempting to dismiss Van Compernolle's claimed substantial impairment, essentially inability to accurately complete payroll sheets, as straining credulity to its breaking point. But, incredulity aside, at best, Van Compernolle has shown only that his

ADHD has caused a moderate impairment in the performance of a major life activity.[6]  Such

a moderate impairment does not establish a disability under the ADA.  *Mahone*, 295 F.3d at

590-91; *see also Orr v. Wal-Mart*, 297 F.3d 720, 724 (8th Cir. 2002) (holding that moderate

limitations of a major life activity do not constitute disabilities under the ADA).  In effect,

Van Compernolle is confusing his impairment, which is not disputed, with a disability.

Impairment and disability are distinct concepts.  *Williams*, 534 U.S. at 195; *Knapp v.

Northwestern Univ.*, 101 F.3d 473, 481 (7th Cir. 1996) ("Not every impairment that affects

an individual's major life activities is a substantially limiting impairment."); *DeMar v. Car-

Freshner Corp.*, 49 F. Supp. 2d 84,  90 (N.D.N.Y. 1999) ("Although almost any impairment

may, of course, in some way affect a major life activity, the ADA clearly does not consider

every impaired person to be disabled.") (*quoting Ryan v. Grae & Rybicki, P.C.*, 135 F.3d 867,

871 (2d Cir. 1998)).  Van Compernolle's impairment may have some affect on his major life

activities, but that effect does not amount to a substantial limitation.

The record reveals that Van Compernolle's impairment effected him in a single,

narrow aspect of his job, filling out payroll sheets.  In all other aspects of his job he was a

---

[6]Moreover, while Van Compernolle's condition may be a lifelong affliction, in his brief he acknowledges that "counseling and medication have helped keep [his] condition under control."  Pl.'s Res. Br. at 41.  This candid admission is another indication that he is not substantially limited in a major life activity.  *See Sutton*, 527 U.S. at 482-83 ("A person whose physical or mental impairment is corrected by medication or other measures does not have an impairment that presently 'substantially limits' a major life activity.  To be sure, a person whose physical or mental impairment is corrected by mitigating measures still has an impairment, but if the impairment is corrected it does not 'substantially limi[t]' a major life activity.").

highly capable police officer. Olney Dep. at 173-74. He developed the department training program, served as a field training officer, and was sought out by his fellow officers for advice on police procedure. In fact, many of his fellow officers testified that Van Compernolle was the best and most knowledgeable police officer in the department. Van Gelderen Aff. ¶¶ 12, 67; Magee Dep. at 42; Michmerhuizen Dep. at 38. Van Compernolle, himself, acknowledged that he did not have any difficulty with the routine, clerical tasks associated with police work including transcribing tickets, filling out police reports, warrant requests, and other evidence forms. In nearly every aspect of his position, his ability to recall, think, multi-task, and focus were not affected by his impairment. Van Compernolle also testified that he was capable of functioning with his wife and children, as well performing his responsibilities in both his position with the Covert Township Police Dand his small business. Van Compernolle Dep. at 17. Consequently, Van Compernolle's difficulties in a single, narrow aspect of his occupation do not amount to a substantial impairment of the major life activity of thinking, as a whole. *Cf. Sutton*, 527 U.S. at 492 (holding that to be substantially limited in the major life activity of working, "one must be precluded from more than one type of job, a specialized job, or a particular job of choice."); *Leisen v. City of Shelbyville*, 153 F.3d 805, 808 (7th Cir. 1998) (noting that plaintiff's struggle with a paramedic certification class did "not show that she was substantially limited in the major life activity of learning, any more than the fact that a particular individual might

not be able to pass a course in physics or philosophy would allow an inference that all learning activity was substantially limited.").

In fact, although Van Compernolle testified that he struggled with the payroll sheets throughout his tenure with the police department, the record indicates that during the three year period in which he was disciplined, he was only reprimanded a total of four times. Considering that Van Compernolle was required to fill out a payroll sheet every two weeks, four erroneous timecards over a three year period does not support his claimed inability to accurately complete mundane paperwork and can hardly be called a substantial impairment. It is also an indication that, despite struggling with the paperwork, he was able to sufficiently and correctly fill out the vast majority of his payroll sheets.

To be sure, his psychologist explained that ADHD sufferers can have difficulty with certain aspects of a job while excelling at others.  Herzog's diagnosis, however, merely echoes Van Compernolle's difficulties with narrow, isolated aspects of his daily activities. Herzog's testimony does not indicate that Van Compernolle is substantially limited in any way.  Consistent with the testimony of the other officers on the force, Herzog explained that Van Compernolle  "was [] very highly qualified, a highly sought after individual for his skills," and did not have any job-related difficulties other than with his payroll sheet.  Herzog Dep. at 53.  Further, Herzog also testified that Van Compernolle's difficulties were limited to paperwork, and then only to a specific type of paperwork, the payroll sheet.  Herzog Dep.

19

at 53. This, too indicates that Van Compernolle was not substantially limited in the major life activity of thinking, but was only moderately impaired in a single aspect of this activity.[7]

Furthermore, inattention to or lack of focus on a narrow, undesirable or challenging aspect of one's occupation is not an unusual occurrence in the average workplace. Van Compernolle has not shown that his difficulties are any different from those experienced by the general, working population. *See Felten v. Eyemart Express, Inc.*, 241 F. Supp. 2d 935, 943 (E.D. Wis. 2003) (holding that symptoms such as forgetfulness, lack of focus, difficulty multi-tasking, and bad memory are commonplace for the average person and concluding that plaintiff failed to demonstrate that his symptoms exceeded the experience of the general population such that he was substantially limited). Given the demanding, detail-oriented, and thought-intensive requirements of police work, Van Compernolle's ability to excel in every aspect of the position, save one, undermines his claim of substantial impairment.

Van Compernolle's academic history also undermines his claim of disability. See *Hess v. Rochester Sch. Dist.*, 396 F. Supp. 2d 65, 75 (D. N.H. 2005) (holding that plaintiff failed to show evidence that "learning" was substantially impaired where his educational background undercut his claim). Van Compernolle earned an associates degree from a local

---

[7]Moreover, the fact that each of Van Compernolle's payroll errors benefitted him undermines his claimed inability to accurately complete payroll sheets. It is reasonable to assume that if he were completely incapable, the errors would have been made in a variety of ways, some for his benefit, some benefitting the City, and would not have been solely in his favor.

community college in criminal justice. While attending school he was on the Dean's list and, following successful completion of the program, served as a tutor. Van Compernolle Dep. at 22. This is another strong indication that his ADHD is a moderate impairment. Additionally, his ability to operate a small business along with his law enforcement responsibilities is further evidence that his ability to think and multi-task is not substantially impaired. While Van Compernolle testified that he had difficulty with inventory and recalling scheduled appointments, these occasional lapses in memory do not appear to have had a substantial effect on his ability to operate the business. Although he now disparages his ability to operate the business, he testified that he was "fairly capable" of conducting his business. Van Compernolle Dep. at 17. Moreover, the fact that his store has been in continuous operation since 2000 speaks for itself and undermines his claim that he is substantially limited in a major life activity. Similar to his police work, Van Compernolle has only produced evidence demonstrating that his ADHD affects a limited portion of the tasks necessary to operate the business and is not a substantial impairment.

Finally, the fact that Van Compernolle experiences occasional bouts of forgetfulness regarding family chores and birthdays does not rise to the level of substantially limiting a major life activity and flies in the face of the Supreme Court's admonition to interpret the ADA's disability definition strictly. *See Williams*, 534 U.S. at 197; *Felten*, 241 F. Supp. 2d at 943 ("Memory lapses, impulsiveness, and poor decision-making are commonplace for the average person; if they constituted disabilities, the ADA would have to be interpreted

broadly, not strictly as the Supreme Court now requires."). If such trivial bouts of forgetfulness equated to a substantial limitation, a legion of middle-aged spouses would soon discover that they suffer from a debilitating affliction and the ADA would have to be interpreted liberally, not strictly.

In the final analysis, Van Compernolle has failed to adduce evidence from which a reasonable jury could conclude that he is substantially limited in a major life activity that an average person can perform. To accept Van Compernolle's claim would be to expand the bounds of disability beyond the demanding standard required to qualify as disabled for purposes of the ADA. The Court cannot accept such a liberal interpretation of disability under the ADA. Accordingly, Van Compernolle has failed to show that he is disabled within the meaning of the ADA.[8]

---

[8]The Court briefly notes two additional problems with Van Compernolle's claim. First, Van Compernolle has not offered and the Court has not found any authority holding that a person suffering from ADHD/ADD is substantially limited in a major life activity. To the contrary, the majority of cases considering the question have concluded that, while ADHD/ADD may be an impairment, the plaintiff was not substantially limited because of his/her diagnosis. *See e.g.*, *Wright v. CompUSA, Inc.*, 352 F.3d 472 (1st Cir. 2003); *Doebele v. Spring/United Mgmt. Co.*, 342 F.3d 1117 (10th Cir. 2003); *Davidson v. Midelfort Clinic, Ltd.*, 133 F.3d 499 (7th Cir. 1998); *Felten*, 241 F. Supp. 2d at 943-44; *Jurosko v. Leviton Mfg. Co., Inc.*, 2002 WL 570884 (W.D.N.C. April 10, 2002); *Price v. National Bd. of Med. Exam'rs*, 966 F. Supp. 419, 427 (S.D.W.Va. 1997). To be sure, it is not impossible to conceive of a situation in which ADHD/ADD may result in a finding of disability for purposes of the ADA, *see Berchovitch v. Baldwin Sch. Inc.*, 133 F.3d 141, 155 (1st Cir. 1998)("On the facts of a specific case, a plaintiff diagnosed with ADHD may have a mental impairment under the meaning of the statute."), but this is not the case. Second, throughout Van Compernolle's brief he contends that he and his fellow officers routinely made similar mistakes on their payroll sheets. This allegation, if accepted, would seem to undercut the premise of Van Compernolle's disability claim. If every officer in the department had similar

2.     *Whether Defendants knew or should have known of Plaintiff's Disability?*

Even if the Court assumed that Van Compernolle was disabled for purposes of the ADA, he would not overcome summary judgment because he has failed to prove that the Defendants had knowledge of his ADHD.  It is quite obvious that in order to hold an employer liable for discrimination under the ADA, there must be evidence that it knew or had reason to know of the employee's disability.  *Monette*, 90 F.3d at 1886; *Jones v. United Parcel Service*, 214 F.3d 402, 406 (3d Cir. 2000) ("It is, of course, an axiom of any ADA claim that the plaintiff be disabled and that the employer be aware of the disability."). Accordingly, the burden is on Van Compernolle to demonstrate that, prior to his termination, the City knew or had reason to know of his purported disability.  *Kocsis v. Multi-Care Mgmt., Inc.*, 97 F.3d 876, 884 (6th Cir. 1996) ("[D]efendant cannot discriminate 'because of' a disability if it has no knowledge of the disability.").

Van Compernolle asserts that Defendants had notice of his disability before he was terminated.  Van Compernolle was fired on August 24, 2004, in accordance with the department's progressive discipline policy, after he filed an erroneous timecard for the third time.  Van Compernolle has not offered any evidence from which a jury could conclude that

---

difficulty completing the payroll sheet, then Van Compernolle's struggle was no different from the average police officer in the City's police department and he would fall outside the definition of "disability" under the ADA.  *See* 42 U.S.C. § 12102(2); 29 C.F.R. § 1630.2(j)(1).

the City, Chief Olney, or Klunder had notice of his disability before his termination.[9]  An employer has notice of the employee's disability when the employee tells the employer that he is disabled.  *Hammon v. DHL Airways, Inc.*, 165 F.3d 441, 450 (6th Cir. 1999).  There is no evidence in the record that Van Compernolle told anyone in the department that he had a disability prior to his termination.  It is undisputed that Van Compernolle was diagnosed with his mental impairment on September 2, 2004, over a week after he was terminated.  It is also not disputed that the first time he informed the City of his diagnosis was at a September 10, 2004 meeting with Klunder to consider his grievance.  Klunder Dep. at 155-56.  Considering that Van Compernolle did not discover that he had ADHD, bipolar disorder, and depression until after his termination, it would be quite impossible for him to have informed the City of his disability before he was fired.  *See Adkins v. Briggs & Stratton*

---

[9]Van Compernolle places a significant degree of reliance on events occurring after his termination.  Following his termination, Van Compernolle immediately pursued a grievance based on his dismissal.  During the course of this multi-stage process he provided evidence of his diagnosis to both Klunder and the city council.  Van Compernolle relies on this evidence to demonstrate that Defendants had knowledge of his disability.  Van Compernolle also contends that his termination was "finalized" on October 13, 2004, when the city council voted to affirm the denial of Van Compernolle's grievance.  Van Compernolle's reliance on events occurring during his post-termination grievance procedure is misplaced.  He was terminated on August 24, 2004, consequently the Court must consider Defendants' knowledge up to this point in time.  Events occurring during any post-termination proceeding are irrelevant to the issue of whether Defendants' knew of his disability and terminated him because of it.  Van Compernolle's assertion that his termination was "finalized" in October is also completely misguided and appears to be an attempt to make up for the obvious shortcomings with regard to evidence of Defendants' pre-termination knowledge.  The city council's vote was one step in the grievance procedure and was not a finalization of the termination.  *See* Exhibit 2, Agreement between the City and Police Officer's Labor Council at 10-13, Pl.'s Res. Br. (discussing multi-stage grievance procedure).

*Corp.*, 159 F.3d 306, 307 (7th Cir. 1998) ("[A]n employer cannot be liable under the ADA for firing an employee when it indisputably had no knowledge of the disability.")  (quoting *Hedberg v. Indiana Bell Tel. Co.*, 47 F.3d 928, 932 (7th Cir. 1995)).

Absent evidence that Van Compernolle informed his employer (or even knew) of his disability before his termination, he relies on isolated, stray references to his difficulties with the payroll sheets and his own speculation as well as the speculation of his fellow officers that there may be something wrong with him.  Taken together, this evidence fails to create a genuine issue of material fact on Defendants' notice of his disability.  According to Van Compernolle, after he was notified that he would be disciplined for the second time he went to Chief Olney and Klunder and explained that he was not intentionally committing the errors and that he did not know "what the problem is."  Van Compernolle Dep. at 118-19. During these conversations he became visibly upset and emotional.  Van Compernolle Dep. at 119.  He also suggested alternative ways for the department to record employee hours. Van Compernolle Dep. at 120-21.  Following notification of his third timecard error, during the disciplinary hearing, Van Compernolle again denied any intentional wrongdoing and generally referred to "some issue that's prohibiting me from doing these stupid things [timecards] as well as I should do them."  Exhibit 4, Transcript of August 9, 2004 Disciplinary Hearing at 13.  Van Compernolle also relies on Van Gelderen's affidavit stating that during a meeting on August 16, 2004 with Klunder to discuss Van Compernolle's situation, he told Klunder "there was something not right with Chris [Van Compernolle]" and

that the officers thought he might have ADD.  Van Gelderen Aff. at ¶ 46.  Klunder acknowledged that this meeting was the first time that someone suggested that Van Compernolle may have ADD.  Klunder Dep. at 151-52.

Van Compernolle's evidence in support of his claim falls well short of the mark.  The record shows that, prior to his termination, he made general references to "some issue" or "problem" with completing his payroll sheets and indicated that he was not intentionally making mistakes.  This does not inform Defendants in any way that Van Compernolle is disabled.  Further, Van Gelderen's mere suspicion that Van Compernolle may have ADD does nothing to impute knowledge of a disability to Defendants.  There are many causes of erroneous employee time cards, some may be intentional, some may be unintentional, and some may be caused by a disability.  But, absent knowledge of a disability, speculation about the cause of a problem does not impute knowledge to Defendants.  Prior to his termination, Van Compernolle and his fellow officers simply made ambiguous references to a problem and speculated as to the cause.  It is undisputed that Van Compernolle made the errors on his payroll sheet and that each of these errors benefitted him.  Faced with these errors, Defendants were not required to extrapolate from his denial of intentional wrongdoing, emotional response to his mistakes, and his general references to a problem that he was disabled in some unknown way. *Hammon*, 165 F.3d at 450 ("The employer is not required to speculate as to the extent of the employee's disability or the employee's need or desire for an accommodation."); *Miller v. National Cas. Co.*, 61 F.3d 627, 630 (8th Cir.1995) (" 'The

ADA does not require clairvoyance.' [The employer] was not obligated to divine the presence of a disability from [the employee's] extended absence from work and the company's knowledge that she was in some sort of stressful family situation.") (citation omitted).

Van Compernolle has failed to produce any evidence, beyond vague, ambiguous assertions and speculation, that demonstrates Defendants knew of his disability prior to his termination.   At best, Van Compernolle has shown that Defendants knew of one of the purported effects of his disability, inability to accurately complete his timecard, and knew that he did not know why he continually had difficulty with his payroll sheet.   Knowledge of a symptom that may be rooted in a disability is not sufficient to make a prima facie case under the ADA.   In *Hedberg v. Indiana Bell Telephone Co., Inc.*, 47 F.3d 928 (7th Cir. 1995), the Seventh Circuit rejected a similar argument.   Plaintiff alleged that he was fired because of a disease that caused him to feel fatigued.   Although there was no evidence that defendant knew of his disability prior to his termination, plaintiff argued that because his firing was based upon the symptoms of his disability, this demonstrated that he was terminated because of his disability.   *Hedberg*, 47 F.3d at 933.   The court flatly rejected this argument:

> Allowing liability when an employer indisputably had no knowledge of the disability, but knew of the disability's effects, far removed from the disability itself and with no obvious link to the disability, would create an enormous sphere of potential liability.   Tardiness and laziness have many causes, few of them based in illness.   The ADA hardly requires that merely because some perceived tardiness and laziness is rooted in disability an employer who has not been informed of the disability, and who has no reason to know of the disability, is bound to retain all apparently tardy and lazy employees on the

chance that they may have a disability that causes their behavior.  The ADA
does not require clairvoyance.

*Id*. at 934.  The rationale of *Hedberg* applies to this case with equal force.  Defendants were

not required to retain Van Compernolle on the chance that his payroll sheet errors were

caused by a disability.  Leading up to and at the time of his dismissal, Defendants had no

knowledge that Van Compernolle had a disability and no reason to know that the disability

could only impair a narrow aspect of his responsibilities.  The only references to a possible

problem were mere speculation and conjecture.[10]

Van Compernolle has failed to establish a genuine issue of material fact on two prongs

of the prima facie case of discrimination under the ADA.  Accordingly, Defendants' motion

for summary judgment on Van Compernolle's ADA claim is granted.

---

[10]To the extent that Van Compernolle relies on Defendants' failure to provide an
accommodation, his reliance is misplaced.  First, an employer does not have any obligation
to provide an accommodation until it receives a proper diagnosis and a request for a specific
accommodation.  *Kaltenberger v. Ohio Coll. of Podiatric Med.*, 162 F.3d 432, 437 (6th Cir.
1998).  Because Van Compernolle was not diagnosed with ADHD and Defendant did not
have any knowledge of his disability until after his termination, Defendants did not have any
obligation to provide an accommodation.  Second, from the Court's review of the record, it
appears that Defendants' actually did offer Van Compernolle an accommodation with regard
to his payroll sheets.  Although Van Compernolle contends that "[h]e asked if [Sergeant Ball]
would meet with him and go over the timecards and schedules before they went to payroll
to confirm that they were accurate.  He was told by the Chief that the [Sergeant] was too busy
to do that and it was unnecessary."  Pl.'s Res. Br. at 16.  The citation to the record in support
of this allegation is to Chief Olney's deposition in which he states that in response to
Van Compernolle's request, "I said that if you want to come in on Monday morning and sit
down with the sergeant to fill out your pay sheet, that's fine."  Olney Dep. at 219.  There is
nothing in the record to indicate that Van Compernolle ever accepted this opportunity.
Obviously, Van Compernolle's allegation is a blatant mischaracterization of the record.

B.    *First Amendment Retaliation Claim*

Van Compernolle also asserts a claim, based upon 42 U.S.C. § 1983, that Defendants violated his First Amendment rights.   He contends that his discipline and eventual termination for payroll sheet infractions were retaliatory actions taken in response to his allegedly protected conduct in violation of his constitutional rights.   Before proceeding to the merits of Van Compernolle's claim, the Court must address Defendants' assertion that the Court lacks subject matter jurisdiction over this constitutional claim brought pursuant to a federal statute.

Defendants argue that exclusive jurisdiction over Van Compernolle's First Amendment retaliation claim is vested in the Michigan Employment Relations Commission ("MERC").   This argument is premised upon their claim that Van Compernolle's constitutional claim is meritless and is really an unfair labor practices claim.   Defendants acknowledge that if the First Amendment claim had merit, the Court would have subject matter jurisdiction.    Def.'s Reply at 6.    They contend, however, that because Van Compernolle has failed to present evidence supporting his constitutional claim, the Court should dismiss the case for lack of subject matter jurisdiction.    This reasoning conflates the Court's power to hear a case with the merits of the claim.   However, "the fact that a complaint may not state a claim upon which relief can be granted is of no relevance to the question of subject matter jurisdiction."   *Cherokee Exp., Inc. v. Cherokee Exp., Inc.*, 924 F.2d 603, 609 (6th Cir. 1991) (quoting *Bush v. State Indus., Inc.*, 599 F.2d 780, 785 (6th

Cir. 1979)). Van Compernolle has alleged a violation of his federal constitutional rights. Compl. ¶¶ 8, 109-20; *see also Smith v. Arkansas Sate Highway Employees, Local 1315*, 441 U.S. 463, 465 (1979) ("The public employee surely can associate and speak freely and petition openly, and he is protected by the First Amendment from retaliation for doing so."). The vehicle through which he vindicates a violation of those rights by a public official is 42 U.S.C. § 1983. *Mitchum v. Foster*, 407 U.S. 225, 242 (1972) ("The very purpose of § 1983 was to interpose the federal courts between the States and the people, as guardians of the people's federal rights – to protect the people from unconstitutional action under color of state law."); *Radvansky v. City of Olmstead Falls*, 395 F.3d 291, 313-14 (6th Cir. 2005) (discussing purpose and legislative history of § 1983). There can be no serious argument that this Court does not have jurisdiction to hear a case arising under a federal statute and alleging violations of the U.S. Constitution. 28 U.S.C. § 1331.

Defendants' real concern appears to be that Van Compernolle has already pursued a grievance through arbitration asserting that he was fired without just cause and is now claiming, for the first time, that he was fired in violation of his constitutional rights. The Supreme Court, however, has held that pursuit of a contractually provided grievance through arbitration does not preclude a plaintiff from litigating his federal statutory rights in a federal court. *See McDonald v. West Branch*, 466 U.S. 284, 290 (1984) (holding that plaintiff, who filed a § 1983 action alleging violations of his First Amendment rights, after an adverse arbitration decision was not precluded from litigating his § 1983 claim because such a rule

"would undermine [§ 1983's] efficacy in protecting federal rights."); *Alexander v. Gardner-Denver Co.*, 415 U.S. 36, 48-49 (1974) (holding, in a Title VII race discrimination case, that the statute's "purpose and procedures strongly suggest that an individual does not forfeit his private cause of action if he first pursues his grievance to final arbitration under the nondiscrimination clause of a collective-bargaining agreement.").   Accordingly, Van Compernolle is not precluded, jurisdictionally or otherwise, from pursuing his § 1983 claim in this Court.

Turning to the merits of Van Compernolle's § 1983 claim, in order to establish a claim of retaliation in violation of the First Amendment, a plaintiff must demonstrate: (1) that the plaintiff was engaged in a constitutionally protected activity; (2) that the defendant's adverse action caused the plaintiff to suffer an injury that would likely chill a person of ordinary firmness from continuing to engage in that activity; and (3) that the adverse action was motivated at least in part as a response to the exercise of the plaintiff's constitutional rights. *Leary v. Daeschner*, 349 F.3d 888, 897 (6th Cir. 2003); *Bloch v. Ribar*, 156 F.3d 673, 678 (6th Cir. 1998).  If the plaintiff establishes these elements "the burden of persuasion shifts to the defendant who must show by a preponderance of the evidence that there were other reasons for the adverse action and that the same adverse action would have resulted even if the plaintiff had not engaged in the protected activity at issue."  *Id.* at 898; *Jackson v. Leighton*, 168 F.3d 903, 909 (6th Cir. 1999).

Because Van Compernolle is a public employee, he has the burden of making two additional showings in order to demonstrate that his conduct was protected. *See e.g.*, *Pickering v. Bd. of Educ. of Twp. High Sch. Dist. 205*, 391 U.S. 563, 574 (1968); *Hardy v. Jefferson Cmty. College*, 260 F.3d 671, 678 (6th Cir. 2001). First, he must establish that the speech involved matters of public interest or concern. *Cockrel v. Shelby County Sch. Dist.*, 270 F.3d 1036, 1048 (6th Cir. 2001). Second, he must also show that his interest in addressing these matters of public concern outweighs the interests of his employer "promoting the efficiency of the public services it performs through its employees." *Leary*, 349 F.3d at 897 (quoting *Pickering*, 391 U.S. at 568).

Whether speech involved a matter of public concern is a question of law for the Court. *Farhat v. Jopke*, 370 F.3d 580, 589 (6th Cir. 2004); *Banks v. Wolfe County Bd. of Educ.*, 330 F.3d 888, 892 (6th Cir. 2003). The employee bears the burden of proving that his or her actions were constitutionally protected in the particular circumstances. *Brandenburg v. Housing Auth. of Irvine*, 253 F.3d 891, 897 (6th Cir. 2001) (citing *Jackson*, 168 F.3d at 909). "Whether an employee's speech addresses a matter of public concern must be determined by the content, form, and context of a given statement, as revealed by the whole record." *Connick v. Myers*, 461 U.S. 138, 147-48 (1983). *See also Evans-Marshall v. Bd. of Educ. of Tipp City Exempted Village School Dist.*, 428 F.3d 223, 229 (6th Cir. 2005). Van Compernolle contends that his speech and activities while serving as the police officer's union president addressed matters of public concern.

The Sixth Circuit has rejected the argument that union membership or speech is inherently a matter of public concern, concluding that "an employee's speech, activity or association, merely because it is union-related, does not touch on a matter of public concern as a matter of law." *Boals v. Gray*, 775 F.2d 686, 692-93 (6th Cir. 1985). Generally, a matter of public concern is a "matter of political, social, or other concern to the community." *Connick*, 461 U.S. at 146. Speech involves matters of public concern when it involves "issues about which information is needed or appropriate to enable the members of society to make informed decisions about the operation of their government." *Brandenburg*, 253 F.3d at 898 (quoting *McKinley v. City of Eloy*, 705 F.2d 1110, 1114 (9th Cir. 1983)). Matters of public concern are "typically matters concerning government policies that are of interest to the public at large . . . ." *City of San Diego v. Roe*, 543 U.S. 77, 80 (2004). *See also Latham v. Office of Atty. Gen. of Ohio*, 395 F.3d 261, 265 (6th Cir. 2005) ("An expression addresses a matter of public concern where its subject matter is such that the public at large would have an important interest in the issue."). The Court must distinguish between matters of public concern, which are protected speech, and internal personnel disputes or complaints about an employer's performance, which are not protected. *Rodgers v. Banks*, 344 F.3d 587, 596-97 (6th Cir. 2003). "Federal courts normally do not review personnel decisions reacting to an employee's behavior 'when a public employee speaks not as a citizen upon matters of public concern, but instead as an employee upon matters of only personal interest.'"

33

*Jackson v. Leighton*, 168 F.3d 903, 909-10 (6th Cir. 1999) (quoting *Connick*, 461 U.S. at 147).

Against the background of *Connick* and subsequent cases the Sixth Circuit has distilled the "public concern" test. *Farhat*, 370 F.3d at 592. Under this test the Court must determine: "the 'focus' of the speech; 'the point of the speech in question'; 'to what purpose the employee spoke'; 'the intent of the speech'; or 'the communicative purpose of the speaker.'" *Id.* The proper inquiry is not what might be 'incidentally conveyed' by the speech, and 'passing' or 'fleeting' references to an arguably public matter do not elevate the speech to a matter of 'public concern' where the 'focus' or 'point' of the speech advances only a private interest." *Id.* at 592-93; *Rodgers*, 344 F.3d at 597.

Applying these principles to the present case, the Court finds that Van Compernolle's union-related speech and activities do not rise to the level of matters of public concern sufficient to support a First Amendment retaliation claim. At best, the focus of Van Compernolle's speech was his, and his fellow officers, private interests and concerns related to their work conditions and employment situation. Van Compernolle relies on his general advocacy on behalf of his fellow union members in his capacity as union president in both individual grievance hearings and employee contract negotiations, as well as his own pursuit of a grievance following his failure to receive a promotion to corporal. Beyond merely identifying three general areas in which he engaged in speech or activity, Van Compernolle has failed to carry his burden of proving that the point or purpose of his

34

speech was to address a matter of public concern and was constitutionally protected.  *See*

*Brandenburg*, 253 F.3d at 897 (holding that the employee bears the burden of proving that

his actions were constitutionally protected in the particular circumstances).  Rather, he

focuses much of his argument on whether Chief Olney acted with an improper motive in

disciplining and terminating Van Compernolle.  Chief Olney's motivation, however, is not

relevant until it is established that Van Compernolle's speech touched on a matter of public

concern.  *Connick*, 461 U.S. at 146 ("[I]f [plaintiff's activity] cannot be fairly characterized

as constituting speech on a matter of public concern, it is unnecessary for us to scrutinize the

reasons for her discharge.").

The union-related speech and activities alleged to be protected conduct address

nothing more than routine labor disputes over terms and conditions of employment.  For

example, Van Compernolle points to his advocacy, during contract negotiations with the

City, for an increase in compensatory time in lieu of overtime pay as evidence of his

protected speech activities.  Van Compernolle assisted in advancing the union's position of

increasing compensatory time from its current level of fifty hours.  Klunder Dep. at 92-93.

The City offered an additional ten hours of compensatory time but sought to eliminate the

officers' ability to replenish their compensatory time during each year.[11]  Klunder Dep. at 92,

---

[11]Van Compernolle completely mischaracterizes the record regarding the
compensatory time issue.  Van Compernolle contends that this issue was "hotly contested"
during the contract negotiation and that Chief Olney wanted it eliminated.  It is somewhat
telling that, in making this claim, Van Compernolle failed to cite to any page of the record
in this case.  The reason being that neither assertion is supported by the record.  In reality,

Magee Dep. at 47-48. Eventually, the union withdrew its proposal and compensatory time remained at fifty hours.

Van Compernolle's speech advocating an increase in compensatory time has little or no significant interest to the public. Whether the City's police force is able to secure additional compensatory time or is able to replenish accrued compensatory time does not involve any government policy of interest to the public at large. It is simply an internal dispute over a condition of the officer's employment. *See Anderson v. Burke County*, 239 F.3d 1216, 1220 (11th Cir. 2001) (holding that plaintiff's speech, a questionnaire referring to grievance procedures, vacation policies, promotion guidelines, and pension benefits, related to employment issues that were not matters of public concern); *Love-Lane v. Martin*, 355 F.3d 766, 776 (4th Cir. 2004) ("'[C]omplaints about conditions of employment or

---

while compensatory time was discussed during the negotiation, "it was just a typical union negotiating thing." Klunder Dep. at 94. In fact, it was not discussed until the union proposed an increase. Klunder Dep. at 94. Furthermore, contrary to Van Compernolle's assertion, compensatory time was not an issue that the parties were going to arbitrate. Klunder Dep. at 90. Moreover, although Van Compernolle repeatedly emphasizes Chief Olney's purported disdain for compensatory time and alleged efforts to eliminate it, neither assertion is supported by the record. Chief Olney testified that he preferred paying overtime to compensatory time because it removed the necessity of rearranging schedules to insure that a sufficient number of officers were on duty. Olney Dep. at 89-90, 106, 129-30. This, however, does not indicate any disdain for compensatory time, only that, as the administrator responsible for staffing the police force, Chief Olney reasonably prefers overtime pay. Further, contrary to Van Compernolle's claim, Chief Olney expressly testified that "I wouldn't get rid of [compensatory time], but I would like to see it restricted somewhat." Olney Dep. at 129. This testimony is also consistent with the City's offer during the contract negotiations of a limited increase in compensatory time but an alteration in the manner it is computed annually, not its elimination. Klunder Dep. at 92.

36

expressions about other matters of personal interest' . . . are not matters of public concern.") (quoting *Stroman v. Colleton County Sch. Dist.*, 981 F.2d 152, 155-56 (4th Cir. 1992)). Knowledge of the information is not necessary to enable the general public to make an informed decision about their government. *Brandenburg*, 253 F.3d at 898. It is an internal employment condition that is only of interest to the officers on the police force.

The same is true of Van Compernolle's speech and activities related to both his grievance and the grievances filed for other officers. Van Compernolle has failed to point to anything in the record indicating the purpose, content, or intent of any speech made during grievance procedures of other officers. *See Kraemer v. Luttrell*, No. 05-5431, 2006 WL 1133290, *4 (6th Cir. April 27, 2006) ("Whether the filing of a grievance is protected depends on the content of the grievance because public employees' speech is protected from retaliatory conduct primarily when the speech relates to a matter of public concern.") (citing *Connick*, 461 U.S. at 144-47; *Hardy v. Jefferson Cmty. Coll.*, 260 F.3d 671, 678 (6th Cir. 2001)). *See also Robinson v. Balog*, 160 F.3d 183, 189-90 (4th Cir. 1998) ("Every public employee's job by definition affects 'the public,' but every public employee's grievance is not thereby of public concern.") The officers deposed in this matter did not recall any specific issue that Van Compernolle addressed during the course of his assistance during grievance procedures. Officer Koichi Magee simply described Van Compernolle as a vocal member of the police force but could not recall any specific issue beyond Van Compernolle's personal grievance over the corporal promotion. Magee Dep. at 60-61, 95-96. Van Gelderen also

testified generally that Van Compernolle was an outspoken advocate who participated in the contract negotiations and assisted officers with grievances.  Van Gelderen Dep. at 58-59.[12] But Van Gelderen could not recall any particular issue that he spoke out against through a grievance or contract negotiation.  Van Gelderen Dep. at 58-59.  Kevin Cisler is the only officer who testified regarding Van Compernolle's participation in a particular grievance hearing.  Cisler explained that Van Compernolle attended a grievance hearing as Cisler's union representative after Cisler was reprimanded for failing to timely deliver information packets to city council members.  Cisler Dep. at 34.  Cisler testified that during the hearing Van Compernolle "just sat there" and did not speak out in any way.  Cisler Dep. at 35.

Absent any indication of the content, form, and context of Van Compernolle's grievance-related speech and actions it is difficult, if not impossible, to conclude that he was addressing a "matter of political, social or other concern to the community" simply by participating in grievance hearings with his fellow officers.  *Connick*, 461 U.S. at 146.  At best, Van Compernolle has demonstrated that his actions were union-related because they arose during grievance proceedings.  But this simple fact does not elevate his speech to a matter of public concern.  *Boals*, 775 F.2d at 693.  Moreover, the only issue that has been specifically identified as arising during a grievance was a routine matter of employee

---

[12]Plaintiff has provided an exhibit purporting to be Van Gelderen's deposition testimony.  Exhibit 32, Pl.'s Res Br.  The transcript, however, is identical to the following exhibit, the deposition transcript of Martin Vander Velde.  Exhibit 33, Pl.'s Res. Br.  The cited portion of Van Gelderen's deposition is attached to Defendants' motion for summary judgment as Exhibit 14.

discipline.  Cisler Dep. at 34-35.  Any speech addressing such an issue is not a matter of

public concern.  *See e.g., Boals*, 775 F.2d at 696 (holding that employee's request for union

representation which resulted in a two-day suspension was not a matter of public concern

because it involved "a challenge to [the employer's] authority, involving a matter of internal

discipline of concern to [plaintiff] alone."); *Cockrel*, 270 F.3d at 1052 ("an employee

grievance or some other private dispute generally does not constitute a matter of public

concern."); *Hoyt v. Andreucci*, 433 F.3d 320, 330 (2d Cir. 2006) ("It is true, of course, that

mere employee grievances do not qualify as matters of public concern.").

Van Compernolle's grievance following his failure to receive a promotion also does

not rise to the level of a matter of public concern.  It is nothing more than the personal

grievance of a single employee expressing his displeasure over an employer's contrary

personnel decision.  *See Farhat*, 370 F.3d at 593 (holding that plaintiff's letters expressing

his own "personal beef" with his employer concerning his deteriorating job situation were

not matters of public concern.).  Van Compernolle's failure to receive a desired promotion

is of no concern to the general public and is purely related to his private interests.  *Gros v.

Port Washington Police Dist.*, 944 F. Supp. 1072, 1081-82 (E.D.N.Y. 1996) (holding that

police officer's speech regarding his failure to be promoted is not a matter of public concern);

*Broderick v. Roache*, 751 F. Supp. 290, 293 (D. Mass. 1990) (holding that speech regarding

a police department's promotional exam and failure to promote a police officer were not

matters of public concern).  Van Compernolle's disagreement with Chief Olney's decision

not to promote him is simply akin to the "'quintessential employee beef' of incompetent management," *Jackson*, 168 F.3d at 910-11, and does not rise to the level of a matter of public concern.

Van Compernolle contends that the Court should view the point of his speech and actions broadly, as targeted to the "very purpose of a union" in that he provided his fellow officers with a voice in department operations and protection from management overreaching. This extremely general view of Van Compernolle's speech cannot be accepted. By this logic, any speech or action, so long as it was taken by a union representative, would implicate the protections of the First Amendment.  That is not the law of this circuit under *Boals* and it is directly contrary to the rationale of *Connick*.  As stated previously, the Sixth Circuit clearly rejected the argument that speech that is merely union-related is a matter of public concern. *Boals*, 775 F.2d at 693.  Moreover, the Supreme Court specifically cautioned that public employee's protected speech is limited to statements that, by their content, form, and context, address a matter of public concern.  *Connick*, 461 U.S. at 147-48.  Otherwise, "virtually every remark - and certainly every criticism directed at a public official – would plant the seed of a constitutional case." *Id*. at 149.  Van Compernolle's broad view of his union-related speech flies in the face of this admonition and attempts to convert routine, internal employment disputes into protectable First Amendment activity.  Furthermore, even when viewed broadly, by his own admission, Van Compernolle's speech involved "ensur[ing] that the patrol officers had some voice . . . in the operation of the police department, and . . .

some protection via the union from oppressive disciplinary action taken by management . . . ." Pl.'s Res. Br. at 32.  In other words, providing his fellow officers with an opportunity to voice their feelings on the inner workings and conditions of their office and various employee discipline matters.  As set forth above, such personal, internal employment disputes are not matters of public concern.  *See e.g.*, *Brandenburg*, 253 F.3d at 898.  Van Compernolle has failed to demonstrate that the issues he addressed were matters of public concern to the general public at large.  Consequently, it is not necessary for the Court to proceed further because he has failed to show that he engaged in protected conduct.  *Connick*, 461 U.S. at 146; *Barnes v. McDowell*, 848 F.2d 725, 733 (6th Cir. 1988) (holding that no further inquiry is necessary where plaintiff's speech did not address a matter of public concern) (citing *Rankin v. McPherson*, 483 U.S. 378 (1987)).

Even assuming that Van Compernolle's general, unspecified union-related activities addressed matters of public concern and were thus protected First Amendment conduct, he has failed to offer any evidence creating a genuine issue of material fact on the issue of whether his speech was a substantial or motivating factor in his termination.  The determination of whether his protected activity was a substantial factor in his termination is a question of fact.  *See e.g.*, *Rahn v. Drake*, 31 F.3d 407, 411 (6th Cir. 1994); *Barnes*, 848 F.2d at 733 n. 9.  While this issue is a question of fact, the determination of whether Van Compernolle has provided sufficient evidence raising a genuine issue of material fact is a question of law.  *See Taylor v. Keith*, 338 F.3d 639, 643 (6th Cir. 2003); *de Llano v.*

41

*Berglund*, 282 F.3d 1031, 1036 (8th Cir. 2002); *Hill v. City of Scranton*, 411 F.3d 118, 127 (3d Cir. 2005) (holding that while the third prong of the First Amendment retaliation test involves a question of fact, "only *genuine* questions of fact should be determined by the jury."). In this case, Van Compernolle has failed to allege evidence creating a genuine issue of material fact on the issue of whether his speech was a substantial or motivating factor in his termination.

In order to establish his retaliation claim, Van Compernolle must prove that his speech was at least a substantial part in the City's decision to terminate him. *See e.g.*, *Leary*, 349 F.3d at 897; *Anderer v. Jones*, 385 F.3d 1043, 1052 n. 14 (7th Cir. 2004). In other words, "[T]he employee must 'point to specific, nonconclusory allegations reasonably linking [the] speech to employer discipline.'" *Rodgers v. Banks*, 344 F.3d 587, 602 (6th Cir. 2003) (quoting *Farmer v. Cleveland Pub. Power*, 295 F.3d 593, 602 (6th Cir. 2002), *abrogated by White v. Columbus Metro. Housing Auth.*, 429 F.3d 232 (6th Cir. 2005)). The sum of Van Compernolle's support for his claim is mischaracterizations of the record, unsupported speculation, and conclusory allegations masked as proof. Van Compernolle portrays Chief Olney as a nefarious, union-busting character filled with animus toward the union, and Van Compernolle in particular, who set out on a plan to terminate Van Compernolle for his protected conduct and rid the department of a union. Nothing in his allegations, however, is supported by the record. Moreover, the record appears to directly contradict his claims.

For example, Van Compernolle contends that the evidence suggests that his outspoken union advocacy made him a target of Chief Olney's ire.  In support of this statement Van Compernolle cites to a portion of Magee's deposition in which he explains that he does not know why Van Compernolle was fired and can only speculate as to the reason.  Magee Dep. at 60-61.  Van Compernolle also cites a portion of Martin Vander Velde's deposition in which he states that *based on what Van Compernolle told him*, he believed Van Compernolle's side of the story.  Vander Velde Dep. at 45.  Van Compernolle also relies on Van Gelderen's affidavit in which he states that Van Compernolle would not have been fired, absent his union activities.  Van Gelderen Aff. at ¶¶ 67-68.  The affidavit is undermined, however, by Van Gelderen's deposition testimony in which he states that his affidavit was simply based upon his subjective belief.  Van Gelderen Dep. at 67-68.  Finally, Van Compernolle also relies on his own testimony which simply states, in a conclusory fashion, his subjective belief that he was dismissed because of his union advocacy.  None of the cited evidence suggests in any objective way that Van Compernolle was targeted for his union activity.  Moreover, Van Compernolle's allegation that Chief Olney was "lay[ing] in wait" or engaging in a set up to trap him, his claim that Defendants "admitted" this fact during arbitration, and his claim that Chief Olney admitted to intentionally reviewing his

43

timecards more carefully completely mischaracterizes the record and finds no support therein.[13]

Furthermore, there is evidence in the record refuting Van Compernolle's claim that Chief Olney bore some personal animosity toward him or his union activities.  Contrary to Van Compernolle's claim that he and Chief Olney clashed over union issues, the record indicates that while the nature of their positions resulted in occasionally being on the opposite side of an issue, the two parties treated each other with mutual respect.  Olney Dep. at 178-79.  In fact, at one point Van Compernolle admits that Chief Olney told him that "he respects a guy in my position" because he was willing to represent his fellow officers in the union and put himself in the difficult position of union president.  Van Compernolle Dep. at 96.[14]  There is also evidence in the record contradicting Van Compernolle's allegation of anti-

---

[13]It bears mentioning that prior to discovering the first discrepancy in Van Compernolle's payroll records, Chief Olney had been told by a former lieutenant that he suspected Van Compernolle was taking advantage of the payroll system.  Olney Dep. at 91-92.  While Van Compernolle disputes the allegation that he was taking advantage of the system, this does nothing to dispute the fact that the commanding officers suspected he was committing a violation.  This suspicion justified the initial scrutiny of Van Compernolle's payroll records.  Furthermore, after discovering rather significant discrepancies in Van Compernolle's payroll records, additional suspicion of his records was reasonable.

[14]To the extent that Van Compernolle argues that Chief Olney's statements regarding increased scrutiny directed at him demonstrates improper motivation, his reliance is misplaced.  Van Compernolle Dep. at 96.  It is a well-known fact of positions of leadership, such as a union president, that the officeholder is open to scrutiny.  This, however, is not evidence of retaliatory motivation.  As noted in the following paragraph, Van Compernolle was not treated differently from his fellow officers.  The scrutiny that comes with a leadership position does not mean that there is a different standard of behavior or more stringent disciplinary policy, it only means that the person is more visible.  In this case, there is no evidence that Van Compernolle was held to a different standard than his fellow

union bias.  In response to officer complaints about Sergeant Ball, Chief Olney organized a

meeting between he and the patrol officers without Ball in attendance so that they could air

their complaints and grievances about him.  This response to the union members' concerns

does not reflect any sort of animus.[15]

Van Compernolle also alleges that he was treated differently from other officers who

committed timecard mistakes and that this demonstrates Chief Olney's improper motivation.

The premise of Van Compernolle's allegation, that officers committed similar mistakes and

were not punished, is not supported by the record.    There is no dispute that other officers

made errors on their timecards.  Van Compernolle, however, has not identified any specific

similarity between the errors he made and those of his fellow officers.  *See Guarino v.*

*Brookfield Twp. Trustees*, 980 F.2d 399, 404-05 (6th Cir. 1992) (holding that the non-moving

party must designate specific facts and that "the designated portions of the record must be

presented with enough specificity that the district court can readily identify the facts upon

which the nonmoving party relies.") (quoting *InterRoyal Corp. v. Sponseller*, 889 F.2d 108,

111 (6th Cir. 1989)).  In fact, in support of his argument that he made similar mistakes to

---

employees.  He, like his coworkers, was expected to accurately record the hours that he
worked.  When he failed to do so, and reported hours that he had not worked, he was
punished.   The simple fact that a person in a position of leadership, such as
Van Compernolle, is open to scrutiny, standing alone, does not demonstrate improper
motivation.

[15]In fact, during Chief Olney's career, he was an active participant in police unions,
serving as a post representative, a member of a union executive board, and as treasurer.  Such
participation does not  reflect the attitude of an anti-union person.

other officers, Van Compernolle has directed the Court to an October 7, 2004 memo from Chief Olney to Klunder detailing the differences between Van Compernolle's mistakes and those of his fellow officers.  Exhibit 15, Oct. 7, 2004 Memorandum at 44-46.  This memo refutes Van Compernolle's claim of disparate treatment and he has not offered any reason to dispute the accuracy or conclusions of the memo.

In general, the errors made by other officers involved placing the correct numbers in the wrong column, mathematical errors, failing to sign or date their card, and improperly carrying holiday and overtime pay.[16]  These errors are of a completely different character than those made by Van Compernolle.  Rather than making computational errors or incorrectly logging time, Van Compernolle submitted payroll sheets containing hours that he never worked.  *See* Exhibit B, E, Pl.'s Compl.; Exhibit 4, Def.'s Br. Summ. J.  The erroneous hours he reported were fashioned out of whole cloth, not simply a computational error or misinterpretation of actual hours worked.  Van Compernolle also makes much of the fact that Sergeant Ball or Chief Olney would occasionally correct officer's mistakes and notify them of the correction.  This does not demonstrate any differential treatment because the errors corrected were less material than those made by Van Compernolle.

There is one officer who committed an error similar to Van Compernolle.  Robert Ten Harmsel filed a time card in July 2003 erroneously reporting that he worked certain

---

[16]Apparently holidays were a frequent payroll problem.  According to Chief Olney, this was a matter of interpretation of the employment contract and officers were not disciplined for such errors.  Exhibit 15, Oct. 7, 2004, Memorandum.

hours that he in fact had not.  Similar to Van Compernolle, when this error was discovered, he was punished.   This undermines Van Compernolle's claim of differential treatment. While in situations involving minor errors, timecards were corrected and officers were not punished, when an officer committed a serious error of erroneously reporting hours as worked, they were punished.   Van Compernolle contends that differential treatment is demonstrated by the fact that Ten Harmsel was only given a written reprimand, while on his first offense, he was suspended.  Van Compernolle's first offense involved four occasions of reporting hours of work that he did not work, totaling 28 hours.   Ex. B, Pl.'s Compl. Although Ten Harmsel was apparently not punished as severely, the record does not contain information on the circumstances or extent of his violation.   Therefore, the record is insufficient to determine if they were actually similarly situated.

Finally, Van Compernolle also relies on a statement allegedly made by Sergeant Ball regarding Van Compernolle's difficulties.  According to Van Compernolle,

> Sergeant Tom Ball was driving me down State Street one day, and I asked him – 'why is it that the chief is singling me out?  You know that other guys are making these problems.'  Tom said, 'Well, it's a management technique.  You take the biggest and the baddest (sic) guy and you knock him down a few pegs, and you're their leader.  You're their head, and that's the way he cuts his management team.'  I said, 'So, I'm going to be made an example of?' and he said, 'I don't know.'"

Van Compernolle Dep. at 96.  Van Compernolle also briefly mentioned "[l]ike Tom Ball also said, sometimes you have to cut the head off the snake and bring the snake into line." Van Compernolle Dep. at 98.  This single, isolated statement by Sergeant Ball does not create

a genuine issue of fact for trial.  First, from the context of the statement it is clear that Ball was giving his own opinion on what had transpired.  Ball's subjective theory as to what Chief Olney's motivation may have been is not sufficient to create an issue of fact for trial.  Second, to the extent that Sergeant Ball's statement was based upon information given to him by Chief Olney, it would be inadmissible hearsay within hearsay which cannot be used to oppose a motion for summary judgment and create a genuine issue of material fact.  *Carter v. Univ. of Toledo*, 349 F.3d 269, 274 (6th Cir. 2003); *Sperle v. Mich. Dept. of Corr.*, 297 F.3d 483, 495 (6th Cir. 2002) ("A party opposing a motion for summary judgment cannot use hearsay or other inadmissible evidence to create a genuine issue of material fact.").

Van Compernolle has failed to provide any specific objective evidence supporting his assertion that he was terminated in retaliation for his union activities.  His allegations are based upon his own subjective notions, the speculation of others, and rank mischaracterization of the record.  The record shows that Chief Olney had one problem with Van Compernolle: his failure to responsibly and accurately complete his payroll sheet.  After repeated occurrences of this problem, Van Compernolle was fired.  Nothing in the record indicates that his union activities played any role in this decision.  Accordingly, Van Compernolle has failed to establish the third prong of the prima facie case for his retaliation claim and Defendants' motion for summary judgment is granted.[17]

---

[17]Defendant Olney and Klunder have also asserted the qualified immunity defense. *See Saucier v. Katz*, 533 U.S. 194 (2001); *Champion v. Outlook*, 380 F.3d 893 (6th Cir. 2004).  Because Van Compernolle has failed to establish that his constitutional rights were

IV.

For the foregoing reasons, Defendants' motion for summary judgment on Van Compernolle's ADA and § 1983 claims is granted.  In light of the disposition of this matter, the only remaining claim is Ms. Van Compernolle's consortium claim.[18]  Because the federal claims have been dismissed the Court declines to take supplemental jurisdiction over Plaintiffs' pendent state claim.  *See* 28 U.S.C. § 1367(c)(3) (2005); *Widgren v. Maple Grove Twp.*, 429 F.3d 575, 586 (6th Cir. 2005) ("When all federal claims are dismissed before trial, the balance of considerations usually will point to dismissing the state claims . . . .") (quoting *Musson Theatrical, Inc. v. Fed. Express Corp.*, 89 F.3d 1244, 1254-55 (6th Cir. 1996)); *Peters v. Fair*, 427 F.3d 1035, 1038 (6th Cir. 2005) (holding that district court did not abuse its discretion in declining supplemental jurisdiction over plaintiffs' state law claims in light of its dismissal of their federal claims).  An order will be entered consistent with this opinion.

Date:  _____May 24, 2006_____        /s/ Robert Holmes Bell_____
                                     ROBERT HOLMES BELL
                                     CHIEF UNITED STATES DISTRICT JUDGE

---

violated, Chief Olney and Klunder are entitled to qualified immunity.  *See Silberstein v. City of Dayton*, 440 F.3d 306, 318-20 (6th Cir. 2006).

[18]In Van Compernolle's response brief he indicated that he stipulated to dismissal of his intentional infliction of emotional distress claim.  Pl.'s Res. Br. at 52.